IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | 20 CR 658 |
| DREVON SYKES, | ) ) | Judge John Z. Lee |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Hanover Park Police Officer Timothy Allen pulled over Drevon Sykes for several traffic violations. During the stop, Officer Allen called a K9 unit to perform a drug sniff. After the K9 unit arrived, Officer Allen assisted in conducting the sniff. The dog alerted to the car, and a subsequent search of the car uncovered a loaded 9mm caliber semi-automatic pistol in the back seat. As a result, Sykes, who had a prior felony conviction, was indicted for possessing a firearm when a felon. *See* 18 U.S.C. § 922(g)(1). Sykes has moved to quash his arrest and suppress all evidence obtained during the search of the car. At the request of the parties, the Court held an evidentiary hearing on the matter. For the reasons below, Sykes's motion is granted.

**I.     Factual Background**

Officer Allen was on patrol just before 8:00 p.m. on August 3, 2020, when he spotted a white Nissan with a cracked windshield. 5/12/21 Hr'g Tr. ("Hr'g Tr.") at

8:16–8:17, ECF No. 48. He began following the Nissan as it closely trailed a dark-colored SUV. *Id.* at 9:16–9:17.

The Nissan turned left, and Officer Allen observed it make two quick lane changes into the rightmost lane. *Id.* at 9:17–10:1. During the second lane change, Officer Allen saw the Nissan cut off one sedan and tailgate another. *Id.* at 10:4–10:8. He continued following the Nissan as it made a right-hand turn into a Shell gas station. *Id.* at 10:14–10:17. Officer Allen activated the lights on his squad car and pulled into the station behind the Nissan. Def.'s Ex. A, Dash Cam Video ("Dash Cam Video") at 0:35.

Officer Allen exited his vehicle and approached the car. *Id.* at 1:16–1:38. He asked the driver for his license and insurance and realized that the driver was Drevon Sykes. *Id.* Officer Allen had encountered Sykes before and knew that Sykes had been arrested previously on narcotics and weapons charges. Hr'g Tr. at 11:6–12:8. Angela Carbajal, whom Officer Allen also recognized (but whose name he could not recall at the time), was in the passenger's seat. *Id.* at 12:21–12:23.

Officer Allen told Sykes that he had stopped the car for several reasons—having a cracked windshield, improper lane usage, following another car too closely, and cutting off a car during a lane change. Dash Cam Video at 1:21–1:28. Sykes retrieved his wallet from a black bag in the back seat of the car and handed his license to Officer Allen. Hr'g Tr. at 13:11–13:16. Carbajal also provided her license and proof of insurance for the car, which belonged to her mom. *Id.* at 52:11–52:12, 82:20–82:24,

2

127:11–127:12.  Officer Allen handed the insurance card back to Carbajal, but held on to her license.  *Id.* at 52:16–52:18.

After this, Officer Allen returned to the squad car and ran Sykes' driver's license number through LEADS—the police department's automated software program— to check for any outstanding warrants.  *Id.* at 13:22–14:2.  Allen also radioed for a K9 officer to come and conduct a drug sniff of the Nissan.  He did this just over a minute after returning to the squad car.  Dash Cam Video at 3:43.  Allen then ran Carbajal's driver's license through LEADS.  Hr'g Tr. at 16:6–16:11.

At several points after returning to the squad car, Officer Allen can be heard drumming his fingers to the tune of the squad car's stereo.  Dash Cam Video at 4:40, 6:39.  According to Allen, he was doing this to pass the time as he was waiting for and reviewing the results from the LEADS program, as well as opening the ticketing software and typing in the information for the first citation.  Hr'g Tr. at 39:16–40:24.  After Officer Allen input the information, he can be heard saying, "This printer is taking forever."  *See id.* at 41:6–21.  Ultimately, Officer Allen issued Sykes two citations—one for the cracked windshield, and another for following the vehicle in front of him too closely.  *Id.* at 17:25–18:4.

Four minutes and seventeen seconds after calling for the K9 unit, the first citation started to print; the printing took eighteen seconds.  Dash Cam Video at 8:00–8:18.  In total, it took Officer Allen five minutes and forty-two seconds to process one copy of the first citation.  *Id.* at 2:36 to 8:18.

3

Just as Officer Allen was ripping the print-out of the first citation from the car's printer, K9 Officer Brian Wiebe arrived, and, together, the officers approached the Nissan to inform Sykes and Carbajal of the drug sniff. *Id.* at 8:18–8:47; Hr'g Tr. at 72:4–72:7. Officer Allen told Sykes and Carbajal to get out of the Nissan, and they complied. Dash Cam Video at 9:06. According to Officer Allen, he did this because, based on his prior experience with Wiebe, he knew that Wiebe "would not want the occupants of the vehicle to be in the vehicle while . . . conducting a free-air sniff." Hr'g Tr. at 25:15–22.

After Sykes and Carbajal got out of the car, Officer Allen performed an initial frisk of Sykes and Carbajal for the sake of officer safety, because Allen knew that Sykes had been previously arrested on weapons charges. *Id.* at 11:6–12:8; 26:5–7; Dash Cam Video at 9:06–10:05. After that, Officer Wiebe informed Sykes that the dog would be performing a free-air sniff around the outside of the car and that Wiebe would not search the inside of the vehicle, unless the dog signified that it had detected drugs. Dash Cam Video at 9:46–10:02.

Officer Allen then directed Sykes and Carbajal to stand by, while Officer Wiebe retrieved the dog and began the sniff by leading the dog around the Nissan. *Id.* at 10:09. About thirty-five seconds into the inspection, the dog indicated that it had detected drugs. *Id.* at 10:45. While Officer Wiebe and the dog finished conducting the sniff, Officer Allen asked Sykes and Carbajal whether they had anything illegal on their persons or in the car. He also asked them whether they had smoked marijuana earlier that day. *Id.* at 10:58–11:38.

4

At this point, Officer Allen conducted a full search of Sykes and Carbajal. *Id.* at 12:19–14:36. Finding nothing, he proceeded to search the Nissan. *Id.* at 14:43. His search of the front seat produced a small, plastic container and a few baggies containing marijuana residue. *Id.* at 17:00–17:03; Gov.'s Ex. A, Incident Report ("Incident Report") at 11, ECF No. 40-1. Allen then searched the back seat and found a loaded Ruger model LC9s 9mm caliber semi-automatic pistol in the black bag belonging to Sykes. Incident Report at 11; Def.'s Ex. A, Sykes Aff. at 4, ECF No. 37-2.

Upon discovering the firearm, Officer Allen alerted Officer Wiebe and attempted to handcuff Sykes, but Sykes fled. Dash Cam Video at 17:24–17:31. Officer Allen ran after him and eventually caught up to Sykes, placing him under arrest. *Id.* at 17:31; Incident Report at 11. Officer Allen later completed the paperwork necessary to issue the second traffic citation at the police station. Hr'g Tr. at 29:3.

Sykes was indicted as a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). *See* Superseding Indictment at 1, ECF No. 16. Defendant Sykes filed this motion to quash his arrest and suppress all evidence obtained from the search of the car.

## II. <u>Analysis</u>

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. When a search is

unreasonable under the Fourth Amendment, the exclusionary rule normally requires that any evidence uncovered during that search be suppressed. *See Utah v. Strieff*, 579 U.S. 232, 237 (2016).

A traffic stop is generally allowed under the Fourth Amendment "where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996)). The probable cause determination is objective and based on the totality of the circumstances. *See United States v. Lewis*, 920 F.3d 483, 489 (7th Cir. 2019). Thus, "[i]f an officer reasonably thinks he sees a driver commit a traffic violation, that is sufficient grounds to pull him over without offending the Constitution." *Id.* (citing *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005)).

"Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)). Ordinary inquiries typically include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* These inquiries "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* "Police may not 'detour[ ]' from that 'mission' to investigate other criminal activity." *United States v. Cole*, ---F.4th ----, 2021 WL 5984977, at *3 (7th Cir. 2021) (quoting *Rodriguez*, 575 U.S. at 356–57).

6

In *Caballes*, the Supreme Court established the general rule that "the use of a well-trained narcotics-detection dog . . . during a lawful traffic stop . . . generally does not implicate legitimate privacy interests." 543 U.S. at 409. That said, in *Rodriguez*, the Supreme Court went on to explain that a dog sniff "is not fairly characterized as part of the officer's traffic mission" because its objective is to detect ordinary criminal wrongdoing, not to ensure road safety. 575 U.S. at 355–56. "A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at 350–51 (quoting *Caballes*, 543 U.S. at 407). The pivotal inquiry is "whether conducting the sniff prolongs–*i.e.*, adds time to–the stop[.]" *Id.* at 357 (internal quotation marks omitted); *see Cole*, 2021 WL 5984977, at *3 ("A detour that prolongs the stop violates the Fourth Amendment unless the officer has reasonable suspicion of other criminal activity to independently justify prolonging the stop." (internal quotation marks omitted)).

In so holding, the Supreme Court in *Rodriguez* rejected the government's argument that an officer may "incrementally prolong a stop to conduct a dog sniff so long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances." *Id.* at 357 (cleaned up). As the Supreme Court saw it, accepting such a proposition would provide an extraordinarily efficient officer with "bonus time to pursue an unrelated criminal investigation" after a run-of-the-mill traffic stop. *Id.* Accordingly, rather than

7

focusing on what hypothetically could or would have occurred, the reasonableness of the seizure centers "on what the police in fact do." *Id.* (questioning how "diligence [could] be gauged other than by noting what the officer actually did and how he did it").

Here, Sykes argues that Officer Allen lacked any reasonable suspicion of criminal drug activity and, thus, unconstitutionally prolonged the traffic stop for the purpose of conducting the drug sniff.[1] For its part, the government concedes that Officer Allen lacked reasonable suspicion to conduct a drug sniff, but argues that it did not unnecessarily prolong the traffic stop. *See* Gov't's Resp. Br. 6–8, ECF No. 40.

Adhering to *Rodriguez*, in evaluating the reasonableness of the seizure, the Court will focus on what Officer Allen in fact did, not what he might have done or

---

[1] Although Sykes also challenges the basis for the traffic stop, he only does so in his reply brief, and "arguments raised for the first time in a reply brief are waived", *Darif v. Holder*, 739 F.3d 329, 336 (7th Cir. 2014). That said, even if he had properly raised the issue, the Court would reach the same result.

Furthermore, Sykes does not contest the reliability of the drug sniff or the probable cause supporting the search of the vehicle after the dog detected the drugs. *See generally* Def.'s Mot. Quash Arrest & Suppress Evidence, ECF No. 37. But it is worth noting that, prior to the drug sniff in this case, Illinois had legalized the personal use of cannabis. *See* 410 Ill. Comp. Stat. 705/10-5 ("[T]he following acts are not a violation of this Act and shall not be a criminal or civil offense[:] . . . possession, consumption, use, purchase, obtaining, or transporting cannabis paraphernalia or an amount of cannabis for personal use that does not exceed the possession limit under Section 10-10 or otherwise in accordance with the requirements of this Act[.]"). Echo, the dog, was trained to detect cannabis, cocaine, heroin, and methamphetamine. Hr'g Tr. at 92:8–17. And, in fact, Echo had alerted to cannabis residue in the car. *Id.* at 98:3–6. Whether the Act impacts the determination of probable cause to search the car on these facts is an issue that neither side has addressed, and the Court too leaves the issue for another day.

could have done in an alternative world. As part of this analysis, it is useful to break the traffic stop into two distinct time periods: (1) the time leading up to and including the moment that Officer Allen ripped the first citation from the printer and (2) the time after Officer Wiebe arrived and Officer Allen got out of his squad car to assist him.

Sykes first argues that Officer Allen purposefully and unnecessarily prolonged the traffic-related mission in the moments leading up to the printing of the first citation. This is incorrect. During the evidentiary hearing, Officer Allen testified that, once he stopped behind the Nissan at the gas station, he immediately exited his squad car, approached the Nissan, informed Sykes of the reasons for the stop, requested his and Carbajal's driver's licenses, and asked for proof of insurance. Officer Allen then returned to his squad car and input both names through the LEADS software program to check for outstanding warrants. While his inquiry was being processed, he briefly called for the K9 Unit and proceeded to review the results as he received them. Next, Allen input the necessary information into a different system to process the first of two traffic citations and waited for the printer to print the ticket for the first citation. This took some time, and Allen audibly expressed his frustration regarding the slowness of the printer and credibly testified that the delay was caused by the slowness of the ticketing system. In the end, a total of five minutes and forty-two seconds elapsed between the time when Officer Allen's returned to his squad car and the first citation printed. Given these facts, the Court finds that Officer

9

Allen did not unnecessarily prolong the steps required to initiate and implement the traffic stop up to the point that he printed Sykes's copy of the first ticket.

Things were different, however, once Officer Wiebe arrived. According to Officer Allen, when an officer prints a ticket for a traffic citation, the mobile printer in their squad car prints two copies of the ticket—one for the driver, and one for the police department. Here, before Allen was able to print out the department's copy of the first citation or commence processing the second one, Officer Wiebe arrived on the scene. Hr'g Tr. at 24:6–21; Dash Cam Video at 8:18–8:43. Rather than continuing his tasks related to the traffic stop, Officer Allen got out of his car and accompanied Officer Wiebe to the Nissan, at which point Allen instructed Sykes and Carbajal to get out of the car so that Officer Wiebe could perform the drug stiff. Dash Cam Video at 8:18–8:50.[2] According to Officer Allen, he did this because he knew that Officer Allen usually insisted that a car be free of any occupants during a drug sniff. Hr'g Tr. at 25:15–22.

Based on this record, the Court finds that the sole reason that Officer Allen stopped processing the traffic citations, got out of his car, approached the Nissan, and ordered Sykes and Carbajal to exit the vehicle was to support and facilitate Officer Wiebe's mission to conduct the drug sniff. It also follows that Officer Allen's

---

[2] It is undisputed that Officer Allen never returned to his squad car to finish printing the police department's copy of the first citation or to begin his processing of the second citation. Hr'g Tr. at 24:6–21 (stating that he was unable to complete printing the department's copy of the first citation or to begin processing the second citation because Officer Wiebe arrived on the scene). Officer Allen admits that he did not begin issuing the second citation until he was back at the police station. *Id.* at 28:24–29:3.

10

subsequent frisk of Sykes and Carbajal also was in support of the drug sniff, because the frisk was made necessary only by the fact that Sykes and Carbajal were no longer inside of their car. *See Rodriguez*, 575 U.S. at 356 ("On-scene investigation into other crimes, however, detours from that mission. So too do safety precautions taken in order to facilitate such detours." (citations omitted)). Because these actions detoured from the mission of the original traffic stop and unnecessarily prolonged the stop, the Fourth Amendment required Officers Allen and Wiebe to possess reasonable suspicion in order to conduct the drug sniff and undertake the accompanying safety precautions, which neither had.

As the government points out, numerous courts have found no constitutional infirmity where a canine search is performed *contemporaneously* with the completion of a traffic stop and its related actions. *See, e.g., United States v. Gholston*, 1 F.4th 492, (7th Cir. 2021) (holding seizure not unreasonably prolonged where officer did not stop working on issuing the warning and the dog alerted as the sole ticket printed); *United States v. Simon*, 937 F.3d 820, 832 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 824 (2020) (holding seizure not unconstitutionally prolonged where officers were processing the ticket while the dog alerted); *United States v. Harry*, 930 F.3d 1000, 1005 (8th Cir. 2019) (holding that dog sniff did not unlawfully extend the stop because the officers "simultaneously processed the traffic violation and conducted the dog sniff."); *United States v. Stewart*, 902 F.3d 664, 676 (7th Cir. 2018) (holding that seizure was not unconstitutionally extended because "the sniff was conducted contemporaneously with the traffic mission of the stop"); *United States v. Offord*, 788

11

F. Appx. 384, 387 (7th Cir. 2019) (holding seizure was not prolonged because other officers conducted the sniff test while another officer was completing the speeding ticket); *United States v. Seay*, 483 F. Supp. 3d 616, 623 (N.D. Ind. 2020) (holding that "the dog sniff did not prolong the stop in any way but was completed simultaneously to a background check being run on Mr. Seay's documentation."); *United States v. Rushin*, No. 16 CR 288, 2017 WL 4944820, at *1 (N.D. Ill. Nov. 1, 2017) (holding that traffic stop was not unnecessarily prolonged when dog sniff was contemporaneous with the completion of the traffic-related purpose of the stop).

But that is not what we have here. Officer Allen admits that he was not printing the police department's copy of the first citation or processing the second citation during the drug sniff. Rather, he completely stopped his traffic-related mission as soon as Officer Wiebe arrived and worked to ensure the safety of Officer Wiebe and support the completion of the canine officer's mission. And, indeed, Officer Allen did not resume processing the two citations until after he had returned to the police station upon Sykes's arrest.

The government, however, offers a different prism through which to view the events. It posits that, because it took Officer Allen about five-and-a-half minutes after returning to his squad car to process and print the first citation (or, at least, one of the two copies of it) and because the dog alerted on the Nissan less than three minutes after the first citation had fully printed, even if Officer Allen had remained in his car and continued processing the second citation, the dog would have alerted

12

Officer Wiebe to the drugs before Officer Allen finished. But this version of the alternative universe suffers from two fatal maladies.

First, it has no support in the factual record. While the intellectual proposition may be superficially appealing, the government has offered no evidence that processing a second citation would have taken the same amount of time as processing the first. And, indeed, the evidence in the record would tend to support the opposite conclusion.[3]

Second, if Officer Allen is correct in believing that Officer Wiebe would not conduct a canine search if there were occupants in the car (and there is no evidence to the contrary), the government's version of the but-for universe is incorrect. Rather than conducting the drug sniff while Officer Allen was processing the two citations, Officer Wiebe would have waited until after Officer Allen was done and proceeded only with Officer Allen's assistance. This, of course, most certainly would have prolonged the traffic stop unnecessarily in violation of the Fourth Amendment.[4]

---

[3] It would be counterintuitive to assume that processing the second citation would take an equal amount of time as processing the first, given that Officer Allen already had entered Sykes's information into the ticketing system and would not need to run another warrant check on LEADS.

[4] This is not to say that unaccompanied K9 officers, who are called to traffic stops, should put themselves unnecessarily at risk and proceed to perform a drug sniff while the only other officer on the scene is busy processing traffic citations. Rather, if a police department wants K9 officers to conduct drug sniffs of vehicles during routine traffic stops, it should not rely upon the officer processing the traffic citations to ensure the safety of the K9 officer or otherwise assist in the drug sniff.

13

### III. Conclusion

For these reasons, Defendant Drevon Sykes's motion to quash his arrest and to suppress evidence is granted.

**IT IS SO ORDERED.**             **ENTERED   1/4/22**

_____

**John Z. Lee**
**United States District Judge**

14